IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of: | No. 82851-7-I |
| A.A., | DIVISION ONE |
| A Minor Child. | UNPUBLISHED OPINION |

ANDRUS, A.C.J. — D.A., father of A.A., appeals an order terminating his parental rights. He contends that the trial court violated his right to due process when it determined that he was unfit to parent A.A. and contends that the termination is invalid because it does not comply with the statutory requirements of RCW 13.34.200(3). We reject both arguments and affirm.

## FACTS

A.A. was born in the spring of 2006 to D.A., her father, and A.K., her mother.[1] Shortly after her birth, A.A. was diagnosed with spina bifida which has resulted in significant and ongoing medical needs. When A.A. was first diagnosed, her mother turned to Dolores Alexander, a close family friend, who became heavily involved in managing A.A.'s medical needs and caring for A.A.

Alexander and A.A.'s mother shared parenting responsibilities for A.A. for most of the child's life and, before trial, A.A. had lived intermittently with Alexander

---

[1] The mother relinquished her parental rights to A.A. on April 6, 2021. She is not a party to this appeal.

Citations and pin cites are based on the Westlaw online version of the cited material.

for an estimated total of 10 to 11 years. In the beginning of her life, A.A.'s father frequently visited A.A. on weekends, but he became less involved over time and, by the time A.A. was six, the father no longer had regular or frequent contact with her. In 2014, Alexander attempted to get third-party custody of A.A. but, after a dispute with A.A.'s mother and maternal grandmother, was unable to complete the process.

In early 2016, A.A.'s mother and maternal grandmother again removed A.A. from Alexander's care and went to great lengths to keep her whereabouts hidden from both her father and child protective services. In June 2016, A.A. was taken into protective custody after she was found alone in a grocery store. In November 2016, A.A. was found dependent as to her mother and in January 2017, her father stipulated that he was not in a position to care for A.A. and agreed to an order of dependency.

In the disposition order, the father was ordered to participate in a Foster Care Assessment Program (FCAP) reunification assessment, a psychiatric evaluation with Dr. JoAnn Solchany, and other services if A.A. were placed with him. The order also authorized up to four hours of visitation between A.A. and her father per week.

Over the course of the dependency, two FCAP assessments were conducted. In 2017, the father participated in the assessment, but reunification was not recommended because he indicated that he lacked the capacity to parent A.A. and he had not had regular contact with A.A. for some time. The second assessment was conducted in 2019 and, despite the program's requests, the

father did not participate. The 2019 FCAP assessment recommended termination of the father's parental rights so that A.A. could achieve permanency. Because of the father's failure to engage with services, the program evaluators did not see a possibility of reunification and did not recommend further services.

The father also completed the required evaluation with Dr. Solchany. Dr. Solchany concluded that the father was intelligent and capable but observed that he had never had A.A. in his sole care at any point and had never been responsible for A.A.'s ongoing medical needs. The father reported to Dr. Solchany that he loved his daughter and wanted a relationship with her but did not want full custody of her. Following the assessment, Dr. Solchany recommended parenting classes and parent-child therapy so that A.A. and her father could reconnect before any decisions were made regarding reunification. However, the Department of Children, Youth and Families (the Department) concluded that therapy was not appropriate and could be damaging to A.A. due to A.A.'s unwillingness to engage with her father.

In April 2019, A.A. was returned to Alexander's care. Since that time, A.A. has only visited with her father twice—once by video call, once by telephone call. Because of the impact the lack of permanency had on her mental health, Alexander enrolled A.A. in the Wraparound with Intensive Services (WISe) program to help A.A. learn to cope. The WISe program is a family engagement program which provides therapy for children of families in crisis. Despite being invited, the father did not participate in that process.

As the dependency progressed, the father began to express wishes for A.A. to be placed in his care. However, during this time he was still not visiting A.A. regularly and was not making progress toward correcting his parental deficiencies. In the fall of 2020, the father filed a motion for a return home, which the court denied after finding that his failure to visit demonstrated "a lack of engagement or care for the child's psychiatric, emotional, or medical needs."

On October 7, 2020, the Department filed a petition seeking termination of the father's parental rights and a three-day trial was held in May 2021. Despite being given many opportunities to attend either in person or remotely, the father did not appear for the trial.

A.A., who was 15 years old at the time of trial, testified that she did not talk to her father at all and did not want to live with him. She explained that she had not been visiting with the father because he had not made any efforts to contact her. She further told the court that she wanted to live with Alexander because it was where she felt safe and she was still able to see her mother and her sister.

The trial court terminated the father's parental rights, largely due to his lack of involvement in A.A.'s life and his failure to commit to consistent visitation or take responsibility for her medical and care needs. The court found that the father was unfit to parent and that termination of his parental rights was in A.A.'s best interests.

The father now appeals.

ANALYSIS

A. Due Process in Determination of Parental Unfitness

The father first contends that the trial court violated his right to due process by improperly considering the best interests of the child when determining his parental unfitness.  We disagree.

Parents enjoy fundamental liberty interests in the continued "care, custody, and management of their child."  Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); In re Dependency of K.N.J., 171 Wn.2d 568, 574, 257 P.3d 522 (2011).  Alleged due process violations are reviewed de novo. In re Dependency of W.W.S., 14 Wn. App. 2d 342, 353, 469 P.3d 1190 (2020).

Pursuant to RCW 13.34.180(1) and RCW 13.34.190, Washington courts use a two-step process in determining whether to terminate parental rights.  In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).  The first step focuses on the adequacy of the parents, while the second step focuses on the child's best interests.  Id.

Under RCW 13.34.180, a party seeking termination of a parent-child relationship must establish the following:

(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

  (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

  (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

These allegations must be proven by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). Once the Department establishes these statutory prerequisites, the trial court must make a finding of current unfitness before parental rights can be terminated. In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

If the foregoing burden is satisfied, termination may be ordered if the Department establishes by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(1)(b); K.N.J., 171 Wn.2d at 577. Only if the first issue is satisfied may the court reach the second. A.B., 168 Wn.2d at 911.

Following trial, the court concluded termination was appropriate and explained its ruling to the parties. The court first found that the Department had proven the six factors in RCW 13.34.180(1) by clear, cogent, and convincing evidence, and then explained its findings on each of the respective elements. While examining the final factor, RCW 13.34.180(1)(f), the court opined that A.A. was "so lucky to have Mrs. Alexander" in her life and stated

> And if we don't terminate the parental rights here, then her prospects for being in a stable home and a permanent home are very low. She was with a social worker in a hotel. I mean, we know what's been happening with the child welfare agencies and how these kids are in hotels, and it's, frankly, horrible. [A.A.] has a much better alternative here with a stable life. . . .
> So, the Department has met by clear and cogent and convincing evidence all the factors under [RCW] 13.34.181.

- 6 -

The trial court then explained its conclusion that termination was also in A.A.'s best interest. In its written termination order, the court reiterated each of its findings, but did not mention A.A.'s placement with Alexander in its determination that the father was unfit to parent A.A.

The father argues that by improperly engaging in a comparison between the father and A.A.'s placement, the trial court focused on A.A.'s best interests rather than on his unfitness to parent. He contends that in doing so, the court failed to adhere to the constitutionally required two-step process and violated his due process rights.

The father relies on the Supreme Court decision in A.B. to support this argument. In that case, the trial court considered the termination of A.B.'s father's parental rights and found that the statutory criteria set forth in RCW 13.34.180 and RCW 13.14.190 had been proven. A.B., 168 Wn.2d at 916. The trial court compared A.B.'s life with her caregiver with A.B.'s lack of significant relationship with her father. Id. at 926. The court then noted that "'it is in [the child's] best interest to maintain a relationship with her father and his family provided that the continuation of that relationship does not constitute a perpetual challenge to the legitimacy of the [current] placement.'" Id. The court failed to find that the father was then unfit to parent. Id. at 917.

On appeal, the father argued that the court had violated his right to due process when it had failed to find that he was unfit to parent and that the court had violated the required two-step process by mixing considerations of his parental fitness with considerations of A.B.'s best interests. Id. at 910, 925. Our Supreme

Court agreed and first concluded that the trial court had not found either expressly or impliedly that the father was unfit to parent. Id. at 920-21. The court further concluded that the trial court's remarks regarding A.B.'s current placement demonstrated that the trial court had "obviously focus[ed] on A.B.'s best interests, as opposed to [the father's] current unfitness." Id. at 926. Thus, the court concluded the trial court had impermissibly considered the second step before resolving the first. Id. at 925.

A.B. is distinguishable from this case. First, unlike in A.B. the trial court here expressly found that the father was unfit to parent A.A. Next, the court did not consider whether the father's continued parental relationship hampered A.A.'s relationship with Alexander and therefore, unlike in A.B., the trial court was not acting to protect the current placement against a claim by an otherwise fit parent. Rather, the record demonstrates that the trial court here permissibly referenced A.A.'s placement while assessing whether the Department had met its burden under RCW 13.34.180(1).

As the Department argues, the trial court's comments about A.A.'s placement with Alexander were made during its consideration of whether continuation of the parent and child relationship diminished A.A.'s prospects for early integration into a stable and permanent home, as required under RCW 13.34.180(1)(f). Such a finding was necessary to the court's determination that the father was unfit to parent.

Whether the continuation of the parent-child relationship diminishes the child's prospects for early integration into a stable and permanent home "implicitly

touches on the best interest of the child standard." In re Parental Rights to J.B., 197 Wn. App. 430, 438, 387 P.3d 1152 (2016). The Department can meet this burden in two ways: it can prove that prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement, or it can demonstrate that the relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement. Id. (quoting In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013)).

> Both ways of proving element (f) contemplate the availability of a permanent and stable home for the child. To that extent, termination element (f) measures parental unfitness by examining whether the parental relationship impedes the child's welfare by diminishing its chances of entering into an enduring home. This directly involves consideration of the child's best interests.

Id. at 439. Because of this, strict compartmentalization of the issues is not required.

The father contends that RCW 13.34.180(1)(f) allows a court to consider whether a child has adoption prospects but does not allow the court to determine whether those prospects provide a "better alternative" to the parent. But the record here does not support the contention that the trial court was making a comparison between Alexander and D.A. when it said that "[A.A.] has a better alternative." The trial court first noted that, if the father's parental rights were left intact, A.A. was likely to continue lacking permanency and stability. The court then stated there was a "better alternative." This comment, considered in context, suggests the court was indicating that permanency and stability was a better alternative to the instability she had suffered over the course of the dependency, which had included

living in temporary housing. This was simply an analysis of whether the father's parental rights were impeding A.A.'s welfare by diminishing her chances of obtaining permanency, which is exactly what the court was required to consider under RCW 13.34.180(1)(f).

The trial court here properly considered each of the statutory elements under RCW 13.34.180(1) and determined that the father was unfit to parent before considering whether termination was in A.A.'s best interest. The father's due process rights were not violated.

B. Lack of Statutory Finding under RCW 13.34.200(3)

The father next argues that the termination order is invalid because it does not comply with the statutory requirements of RCW 13.34.200(3).

RCW 13.34.200(3) provides that "[a]n order terminating the parent-child relationship shall include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits." The trial court found that A.A. "enjoys frequent contact and connection with her sister, [K.A.]. [K.A.] lives with [A.A.'s] mother." But there is no reference to any other siblings in the court's findings.[2]

In the termination petition, the Department alleged that A.A.'s mother has two children in addition to K.A. and A.A. But the Department presented no evidence at trial as to these siblings, their ages, with whom they reside, and their relationship, if any, with A.A. As a result, the trial court made no findings regarding

---

[2] The Department did include the language of this provision in its trial memorandum, but did not present evidence relevant to A.A.'s sibling relations.

A.A.'s relationships with these siblings, her contact with them or any visits they have had.

The father argues that, because the court failed to comply with RCW 13.34.200(3)'s statutory mandate, the entire termination order is invalid and must be vacated or remanded for correction. The Department, by contrast, argues that vacation is not warranted because RCW 13.34.200(3) is not an element required to be proven before parental rights are terminated.

The lack of a finding regarding A.A.'s relationship with two unnamed siblings does not require us to reverse the order of termination. This court recently held that the status of a child's sibling relationships is not an element necessary to support a termination order. In re Dependency of J.D.P., 17 Wn. App. 2d 744, 759, 487 P.3d 960 (2021). We stated

> Unlike RCW 13.34.190(1)(a) and (b), which require the trial court to make findings that the requirements of RCW 13.34.180(1) are established by clear and convincing evidence, and a finding that termination is in the best interests of the child, RCW 13.34.200(3) is a separate provision. As discussed above, the status of sibling relations is not a required element to support a termination finding. Instead, RCW 13.34.200(3) requires only that the trial court include a statement in the termination order concerning the status of sibling relationships. Unlike the required findings in RCW 13.34.190(1)(a) and (b), RCW 13.34.200(3) is more akin to a ministerial requirement that ensures that the termination order acknowledges the existence and status of sibling relationships.

Id. Because this statute does not require the Department to prove that A.A. has a relationship with all of her siblings before a court may terminate parental rights, a failure to make a statement about A.A.'s relationship (or lack thereof) with every

sibling she may have, does not require us to reverse the order terminating the father's rights.[3]

Nor does the father provide support for the proposition that the trial court has to make findings as to every sibling that may exist, even when these siblings may have never had a relationship with A.A. The trial court cannot make a finding about sibling relationships when no evidence is presented that there are other siblings or that the child has or does not have a relationship with these siblings. The trial court did find that A.A. has a strong relationship with, and the opportunity to visit her sister, K.A., on a regular basis. This finding satisfies RCW 13.34.200(3).

Affirmed.

Andrus, A.C.J.

WE CONCUR:

---

[3] There is nothing in the record to suggest that these other unnamed siblings are the father's biological children.

- 12 -